UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARCOS RODRIGUEZ,

                                Petitioner,

         -v-

WILLIAM LEE, *Superintendent of the Eastern Correctional Facility*,

                                Respondent.

19 Civ. 8398 (PAE) (SLC)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

      This decision addresses a post-conviction challenge to a state-court murder conviction. Petitioner Marcos Rodriguez brings a petition for a writ of habeas corpus (the "Petition") under 28 U.S.C. § 2254. He challenges a 2001 judgment (the "Judgment") entered after his conviction at trial on two counts of second-degree murder in New York State Supreme Court in Bronx County. Dkts. 1, 1-1.[1] Rodriguez is presently serving a 25-years-to-life prison sentence in Eastern Correctional Facility, whose warden he sues.

      The murder of which Rodriguez was convicted arose from the kidnapping of Ricardo Gomez ("Gomez"), who had reneged on a narcotics debt to Rodriguez. On May 23, 2001, Rodriguez and others kidnapped and assaulted Gomez in Rhode Island, bound and stuffed him in the trunk of a car, and then brought him to New York. Gomez's bound and burned remains were found two days later under the Whitestone Bridge in the Bronx. The Petition's three claims largely derive from Rodriguez's contention that Gomez died before reaching New York, meaning New York lacked jurisdiction over the murder charges.

---

[1] The petition was filed in two segments. All citations refer to internal document page numbers, unless otherwise noted.

The Petition, first, argues that New York lacked territorial jurisdiction to prosecute Rodriguez for murder, in violation of the Fourteenth Amendment and Article 1 § 6 of the New York Constitution.  The Petition, second, argues that Rodriguez was denied effective assistance of counsel at trial, in violation of the Sixth Amendments of the United States and New York Constitutions, based on asserted lapses by his counsel, Telesforo Del Valle, Jr.  These included not requesting a jury instruction on territorial jurisdiction, as opposed to the approach taken by the trial court, which instructed the jury that to convict Rodriguez of murder, it had to find that the murder had occurred in New York, and that such could be demonstrated by proof beyond a reasonable doubt that the victim had died in New York.  The Petition also faults Del Valle for not pursuing an accomplice-in-fact instruction for Rodriguez's ex-girlfriend, Martha Villalona ("Martha"), who testified against him; for not obtaining Martha's testimony from a separate proceeding in Rhode Island; and for not raising a Confrontation Clause claim to a medical examiner's testimony about an autopsy report.  The Petition, third, argues that the Bronx District Attorney, who prosecuted Rodriguez, failed to disclose certain exculpatory and impeachment materials, specifically Martha's Rhode Island testimony, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"), and *People v. Rosario*, 9 N.Y.2d 286, 289 (1961) ("*Rosario*").  *See* Petition at 15–33.

On October 1, 2019, the Court referred the Petition to the Honorable Sarah L. Cave, United States Magistrate Judge.  Dkt. 5.  On November 25, 2019, Lee filed a memorandum opposing the Petition, Dkt. 12-1 ("Opp."), an accompanying declaration, Dkt. 12, and 20 exhibits, Dkts. 12-2–22.  On February 18, 2020, Rodriguez replied.  Dkt. 15.

On June 28, 2022, Judge Cave issued a detailed Report and Recommendation.  *See* Dkt. 20 ("Report").  It recommends that the Court deny the Petition in full.

As to territorial jurisdiction, the Report notes that the New York courts have rejected, on independent and inadequate state-law grounds, Rodriguez's post-conviction challenge under the New York Constitution.  *Id.* at 23–25.  And, to the extent the Petition frames this challenge as under the federal Constitution, the Report finds that Rodriguez has never claimed a federal constitutional violation of this nature in state court, including post-conviction, and therefore has not exhausted such a claim.  *Id.* at 26–28.  In any event, the Report finds, such a claim fails on the merits, because there was sufficient evidence on which the jury could find that Gomez had died in New York, supplying jurisdiction.  *Id.* at 28–31.

As to ineffective assistance, the Report finds that Rodriguez has not shown that trial counsel's performance fell below professional standards or was an unreasonable exercise of professional judgment, taken as a whole or in connection with the specific lapses Rodriguez claims.  *Id.* at 32–45.  The Report also does not find the asserted lapses prejudicial, including because, as to territorial jurisdiction, there was sufficient evidence that Gomez died in New York.  *Id.*

Finally, as to Rodriguez's *Brady-Rosario* claim based on the asserted non-disclosure of Martha's Rhode Island testimony, the Reports finds it procedurally and substantively deficient. *Id.* at 45–47.

On July 24, 2022, Rodriguez timely filed objections.  Dkt. 23 ("Obj."); Dkt. 22 (granting extension of deadline to file objections).  On August 7, 2022, Lee replied to these Objections. Dkt. 24 ("Obj. Reply").

For the reasons that follow, the Court adopts the Report in its entirety and therefore denies the Petition.

## I.      Background

The Court adopts the Report's account of the facts and procedural history, to which no party has objected. *See* Report at 3–19. The following summary captures the limited facts necessary to assess the issues presented.

### A.      The Events Surrounding Gomez's Murder

#### 1.      Gomez's Drug Debt to Rodriguez

In early 1999, in Providence, Rhode Island, Gomez purchased, on credit, two kilograms of cocaine worth about $67,000 from Rodriguez. Petition at 5 ¶ 11; Dkt. 12-1 at 2. After Gomez failed to repay Rodriguez, Rodriguez made escalating threats to Gomez, Gomez's wife, Emily Gomez ("Emily"), and Gomez's father, Rafael Gomez ("Rafael"). Petition at 5 ¶¶ 11–12; Dkt. 12-1 at 2. Rodriguez also threatened Gomez at his home "many times," sometimes accompanied by Edward "Popito" Pozo ("Pozo"). Opp. at 3. In late March 1999, Rodriguez's girlfriend, Martha, visited Emily at her job and demanded that Gomez pay his debt to Rodriguez. Petition at 5 ¶ 12. Gomez paid $1,000 of the debt. *Id.*

#### 2.      Gomez's Kidnapping, Transport, and Murder

On May 22, 1999, Martha received a call from an unidentified person who stated that he had sold Rodriguez the drugs he resold to Gomez. Dkt. 12-11 ("330.30 Decision") at 2. The caller threatened that, if Gomez did not pay for the drugs, Gomez's family in New York would be killed. *Id.* Martha relayed the threat to Gomez. *Id.*

Also on May 22, 1999, between 6 p.m. and midnight or early the following morning, Gomez, Emily, and Rafael were at a family party. Petition at 5 ¶ 13. Gomez had been drinking all evening and appeared drunk. *Id.* Between 12:30 a.m. and 1 a.m. on May 23, 1999, Gomez left the party with a friend. *Id.* Gomez was never seen alive again by his wife or father. *Id.*

Around 2:30 a.m. on May 23, 1999, Rodriguez and Martha were asleep in her bedroom in her apartment. *Id.* at 6 ¶ 14. Martha heard a tapping on her window. Opp. at 3. Rodriguez allowed three men—Pozo, an unidentified Puerto Rican man, and an unidentified Dominican man—who had Gomez with them, to enter Martha's apartment. Petition at 6 ¶ 14. Martha remained in the bedroom and did not see Gomez, but she recognized his voice. *Id.* She heard Gomez begging, "Don't kill me, please . . . I have money to pay you." *Id.* (alterations omitted). Martha heard Rodriguez tell Gomez that he was a "robber," and that he was "going to be killed." *Id.* Rodriguez and one of the other men came into the bedroom and took floral bed sheets from a closet that matched a cover on Martha's bed. *Id.* Martha heard the men hitting Gomez, ripping bedsheets, and tearing plastic. *Id.* Gomez's yelling eventually became muffled. *Id.* at 6 ¶ 15; 330.30 Decision at 2.

Rodriguez took Martha's car keys and gave them to Pozo to retrieve the car. Petition at 6 ¶ 15; 330.30 Decision at 2. Pozo and the other two men took Gomez from Martha's apartment to her car, while Rodriguez stayed in the apartment. Petition at 6 ¶ 15; 330.30 Decision at 2. Rodriguez told Martha that he planned to take Gomez to New York to kill him, and that if Martha contacted the police, he would kill her. Petition at 6 ¶ 15; 330.30 Decision at 2. Soon after, Pozo returned to the apartment. Martha saw him and Rodriguez drive away in her car, which was never returned to her. Petition at 6 ¶ 15; 330.30 Decision at 2.

On May 24, 1999, Rodriguez called Martha. He stated that he was in New York and that he would kill her and her son if she told the police what had happened the previous evening. 330.30 Decision at 2–3. Martha abandoned her apartment that day. Opp. at 4. Either that night or the night of May 25, 1999, Rafael saw Rodriguez. Petition at 6 ¶ 16. Rodriguez asked Rafael

if Gomez had disappeared and stated that Rafael was responsible.  *Id.*  Rodriguez told Rafael, unprompted, that he had not killed Gomez.  *Id.*; 330.30 Decision at 3.

### 3.    Gomez's Body Is Found, and the Investigation Implicates Rodriguez

At approximately 11 a.m. on May 25, 1999, land surveyor Donald Coleman discovered a dead body—later identified as Gomez's—beneath the Whitestone Bridge in the Bronx.  330.30 Decision at 3.  Police officers arrived approximately 30 minutes later, followed by a New York City Police Department ("NYPD") Detective.  Petition at 7 ¶ 17.  They examined Gomez's body, which was "burned pretty much beyond recognition," Opp. at 5 (quoting trial transcript), and appeared to have been burned where it was found, 330.30 Decision at 3.  Gomez's hands and feet were bound; his face was covered with burned plastic and a floral-patterned sheet.  330.30 Decision at 3; Opp. at 5.  The body was identified as Gomez's using fingerprints and identification information found in his pockets.  Opp. at 5.

At 1:40 p.m., Assistant Medical Examiner Manuel Montez ("Dr. Montez") conducted an on-scene initial examination of Gomez's body.  Petition at 7 ¶ 18.  Dr. Montez later performed an autopsy and prepared an autopsy report.  Opp. at 6; 330.30 Decision at 3.  At trial, Assistant Medical Examiner Susan Ely ("Dr. Ely"), who was not present at the autopsy, testified as to the cause of Gomez's death based on the Autopsy Report and crime scene evidence.  Petition at 7–8 ¶ 20; 330.30 Decision at 3–4.  Dr. Ely noted no signs of shooting or stabbing.  She testified that, based on the Autopsy Report and her expertise, the cause of Gomez's death was asphyxiation.  330.30 Decision at 3; Petition at 7–8 ¶ 20.  Dr. Ely opined that Gomez had died before his body was burned because no soot was found in his airways.  Opp. at 6.

A toxicology report showed opiates and cocaine, but not alcohol, in Gomez's system.  Petition at 8 ¶ 20; Opp. at 6.  Based on this report and the processes by which a body eliminates alcohol, Dr. Ely opined that, assuming that Gomez had consumed four drinks of alcohol, he had

been alive for at least five or six hours after he stopped drinking.  Opp. at 6; 330.30 Decision at 3–4 & n.3.  From the "lividity pattern" visible in photographs of Gomez's body at the crime scene, Dr. Ely concluded that Gomez had died fewer than eight hours before Dr. Montez examined the body at 1:40 p.m. on May 25, 1999.  330.30 Decision at 4 & n.4.  The autopsy report did not provide a time of death, and Dr. Ely did not initially provide one, but the trial judge construed Dr. Ely's testimony to mean that Gomez's had died within eight hours "before he was placed where he was found" under the Whitestone Bridge.  *Id.*; Petition at 8 ¶ 20.  Dr Ely, in fact, clarified on cross-examination that her conclusion was that Ricardo had died within eight hours of being discovered and photographed at 1:40 p.m.  Opp. at 6.

On June 9 and 10, 1999, NYPD detectives and Providence Police Department officers inspected Martha's apartment, with her consent.  It had been unoccupied since May 24, 1999, when she had left.  *See* Petition at 7 ¶ 19; Opp. at 5; 330.30 Decision at 4.  Detectives from the NYPD and the Providence Police Department found blood stains outside and on the wall, bed linens that matched those used to bind Gomez, and a missing couch cushion, stained with blood, in a plastic bag in a closet.  330.30 Decision at 4.  The blood was later found to match Gomez's DNA.  *Id.*

In September 1999, during a search for Rodriguez and Pozo, NYPD determined that Rodriguez's mother was living in Washington Heights, and that his ex-girlfriend Martha was living in the Bronx.  330.30 Decision at 4.  NYPD placed "Wanted" posters in those areas.  *Id.* at 5.  Martha had initially denied being in her apartment when Gomez was kidnapped, but later "decided to tell the truth" about Rodriguez and the Gomez murder.  Petition at 7 ¶ 19; 330.30 Decision at 4–5.  On December 1, 1999, and June 24, 2000, the NYPD apprehended Pozo and Rodriguez, respectively.  330.30 Decision at 5.

### B.   State-Court Prosecutions of Rodriguez and Pozo

#### 1.   New York State Criminal Proceedings

##### a.   Indictment and Pretrial Proceedings

On or about June 30, 2000, a Bronx County grand jury returned an indictment charging Rodriguez with three counts of second-degree murder arising out of Gomez's murder. These charged intentional murder under New York Penal Law § 125.25(1); murder with depraved indifference, *id*. § 125.25(2); and felony murder, *id*. § 125.25(3). Petition at 2 ¶ 1; Dkt. 12-2 (the "Indictment").

Through Del Valle, who represented Rodriguez pretrial and at trial, Dkt. 12 ¶ 7, Rodriguez moved pretrial for discovery, suppression, inspection of grand jury minutes, dismissal of the Indictment, and a bill of particulars. Dkt. 12-3; Dkt. 12 ¶ 8. On November 27, 2000, Bronx Supreme Court Justice William C. Donnino, while denying the bulk of these motions, granted Rodriguez hearings to determine the voluntariness of a statement, under *People v. Harris*, 25 N.Y.2d 175 (N.Y. 1969), and an identification witness's familiarity with Rodriguez, under *People v. Rodriguez*, 79 N.Y.2d 445 (N.Y. 1992). Dkt. 12 ¶ 9; Dkt. 12-5. In November 2001, Rodriguez made a supplemental *pro se* motion for discovery, Dkt. 12-6. The record does not reflect the disposition of this motion, Dkt. 12 ¶ 10.

##### b.   Trial

Rodriguez's jury trial, over which Justice Donnino presided, included testimony from Rodriguez's girlfriend, Martha; Gomez's wife, Emily; Gomez's father, Rafael; the surveyor who discovered Gomez's body beneath the Whitestone Bridge; and a crime scene detective from that site; Dr. Ely, who testified at trial based on the report of her colleague Dr. Montez; detectives who inspected Rodriguez and Martha's apartment; and others. *See* 330.30 Decision at 1 n.1. At

the close of the prosecution's case, Rodriguez moved for dismissal.  330.30 Decision at 5.  Judge
Donnino denied that motion.  *Id.*

The defense called a single witness, Detective Kenneth Leuck.  *Id.*  Attempting to
undermine Emily's testimony, defense counsel elicited testimony about inconsistent statements
that Emily had made about conflicts between Gomez and other drug dealers, and testimony that
Gomez's family had threatened Martha.  *Id.*; Opp. at 7.  The prosecution, to rehabilitate Emily's
and Martha's testimony, on cross-examination elicited testimony contextualizing this evidence.
In his closing argument, Del Valle disputed Rodriguez's guilt, including by noting the absence of
physical evidence linking him to the crime, arguing that others had a greater motive to kill
Gomez, and challenging the testimony by Martha and Gomez's family that implicated
Rodriguez.  Petition at 9 ¶ 23; 330.30 Decision at 6.

Justice Donnino provided the parties with proposed final jury instructions, to which Del
Valle did not object.  330.30 Decision at 5; *see* Report at 9 (quoting instructions).  These did not
contain a distinct instruction as to territorial jurisdiction.  330.30 Decision at 6–7.  However, in
the course of instructing the jury on the elements of murder, Justice Donnino instructed the jury
that, among the elements the People were required to prove beyond a reasonable doubt was that
the murder had occurred "within the geographical jurisdiction of the County of the Bronx."  He
instructed the jury that, if it determined that Gomez's body had been found in the Bronx, a
mandatory but rebuttable presumption would arise that the murder had occurred in the Bronx.
*See* Report at 9 (quoting 330.30 Decision at 6).  Del Valle agreed that these instructions "were
satisfactory."  Petition at 9–10 ¶ 24.

On December 11, 2001, the jury found Rodriguez guilty of two of the three second-
degree murder charges: intentional murder and felony murder.  *Id.* at 2 ¶ 2; *id.* at 10 ¶ 25.  On

October 10, 2002, Justice Donnino sentenced Rodriguez on each count to a prison term of 25 years to life, the terms to run concurrently.  *Id.* at 15 ¶ 38.

On November 13, 2002, through retained counsel Raymond Sussman, Esq. ("Sussman"), Rodriguez filed a notice of appeal in Bronx County Supreme Court from his conviction and sentence.  The notice was filed two days after Rodriguez's deadline to appeal had expired.  *See* Dkt. 12-12 ("Notice of Appeal"); Dkt. 12 ¶ 20; Report at 10.

### 2.    Rhode Island Criminal Proceedings

After his conviction in New York, Rodriguez was transported to Rhode Island, where he had been indicted by state authorities on charges of kidnapping and conspiracy to commit kidnapping on July 7, 2000.  *See State v. Rodriguez*, 917 A.2d 409, 412 (R.I. 2007) ("*Rodriguez II*"); *State v. Rodriguez*, No. P1/00-2232A, 2004 WL 603516 (R.I. Sup. Ct. Mar. 16, 2004) ("*Rodriguez I*").  The Rhode Island trial court denied Rodriguez's motion to dismiss the kidnapping charge on double jeopardy grounds on the basis of the New York case.  It noted that murder and kidnapping crimes were justifiably prosecuted in different states, because "the evidence would tend to show that Ricardo Gomez was kidnapped in Rhode Island[,] . . . was in continuous kidnapped custody until he was killed[] [and,] [w]herever the fatal blow was struck or Ricardo Gomez drew his last breath, the presence of his remains in New York gave that state the strongest *prima facie* jurisdiction claim to prosecute the homicide."  *Rodriguez I*, 2004 WL 603516, at *3.  The Rhode Island Supreme Court affirmed.  It recognized that "under the principle of dual sovereignty, the same villainous act may give rise to separate offenses in two jurisdictions."  *Rodriguez II*, 917 A.2d at 412.

While awaiting trial in Rhode Island, Rodriguez filed, in federal district court in Rhode Island, a petition for writ of habeas corpus under 28 U.S.C. § 2254.  He again raised a double jeopardy claim.  *Rodriguez v. McCauley*, No. C.A. 08-112ML, 2008 WL 3200724 (D.R.I. Aug.

6, 2008) ("*Rodriguez III*").  On August 6, 2008, the Honorable Mary M. Lisi, United States District Judge, denied and dismissed the petition.  *Id.*

Notwithstanding its latitude to pursue such charges, the understanding of the Bronx District Attorney (the "Bronx DA") is that, "at the latest in 2011," Rhode Island's prosecution of Rodriguez for kidnapping and conspiracy to commit kidnapping "ceased."  Dkt. 12 ¶ 25.

### 3.   New York State-Court Post-Conviction Proceedings

#### a.   *New Counsel's § 330.30 Motion*

On December 20, 2001, after the New York state conviction but before sentencing, Rodriguez, through new counsel Sussman, filed a motion to set aside the conviction, pursuant to New York Criminal Procedure Law ("NYCPL") § 330.30.  Dkt. 12-7.  The 330.30 Motion challenged the conviction on four grounds: (1) the trial court had lacked territorial jurisdiction; (2) Del Valle's representation was ineffective; (3) the Bronx DA had withheld material it had been obliged to disclose under *Brady* and *Rosario*, including statements Martha had made to federal law enforcement in December 1999 that purportedly might have rebutted the presumption of territorial jurisdiction; and (4) an accomplice-in-fact instruction should have been given as to Martha's testimony.  *Id.* at 1–2.

In an accompanying affirmation, Sussman developed these arguments.  He argued that the statutory presumption of territorial jurisdiction based on where a murder victim's body has been found, NYCPL § 20.30(2), on which the trial court's jury instructions had drawn, violated the United States and New York Constitutions.  In any event, he argued, the evidence at trial "defeat[ed]" this presumption.  This included the absence on Gomez's death certificate of a statement as to the location of his death; the fact that there had been a "two-day time lapse" between Gomez's kidnapping in Rhode Island and the discovery of his body in the Bronx; and the fact that co-conspirator Pozo had been charged by federal authorities in Rhode Island in

11

connection with the murder. *Id.* at 3–5. Del Valle submitted an affirmation. Dkt. 12-8. In support of the claim of ineffective assistance, he attested that his failures to move to dismiss the indictment for lack of territorial jurisdiction or to request an accomplice-in-fact instruction as to Martha had not been strategic decisions. *Id.* In support of the *Rosario* claim, Del Valle stated that, as of the trial, he had not known of or been furnished the minutes of testimony Martha had given on December 30 and 31, 1999 in federal proceedings against Pozo in Rhode Island. *Id.*; Report at 11.

The Bronx DA opposed the 330.30 Motion. *See* Dkt. 12-9. It defended Del Valle's representation as professional and effective. It argued that he had been effective, despite not seeking a separate jury instruction on territorial jurisdiction. *Id.* at 6. Justice Donnino, it noted, had correctly charged jurisdiction as an element of each of the murder counts. This included instructing that, to convict, the jury was required to find beyond a reasonable doubt that, "within the geographical jurisdiction of the County of the Bronx, the defendant himself or acting in concert with another caused the death of Ricardo Gomez by asphyxiation," *id.* at 3–5, and that, under NYCPL § 330.30, a presumption that death had occurred in the place where the body was found arose. This presumption, the Bronx DA further argued, was sensible policy. And, it noted, as to Del Valle's jury advocacy on that issue, he had "tested the waters regarding the jurors' receptiveness to jurisdiction arguments" and received "a clearly perceptive negative reaction," leading him to shift focus to other areas. *Id.* at 5–7. The Bronx DA also disputed that it had withheld exculpatory evidence from proceedings in Rhode Island. *Id.* at 7–8. It noted that Rhode Island is a separate sovereign not under the control of the Bronx DA, and that the Bronx DA had never been in possession of the hearing transcript from Rhode Island's prosecution of Pozo until it was served on the DA in connection with the § 330.30 motion. *Id.* at 8. It also

noted that it had produced to Del Valle all reports of Martha's interviews by Rhode Island authorities to the extent these had been in its possession—and that Del Valle had used those reports during cross-examination. *Id.* Finally, it argued that Martha had not been an accomplice of Rodriguez's, and therefore that the absence of an accomplice instruction was a meritless argument. *Id.* at 9.

On September 20, 2002, Rodriguez filed a reply in further support of his 330.30 Motion, addressing only the *Rosario* argument concerning Martha's Rhode Island testimony. Dkt. 12-10.

On February 4, 2003, Justice Donnino denied the 330.30 Motion. He held that Rodriguez had been "properly prosecuted and convicted in New York." *See* 330.30 Decision at 20. He held that the evidentiary record "demonstrate[d] the existence of territorial jurisdiction"; that the jury instruction as to the jurisdictional element of murder had been correct; that Del Valle thus had not been ineffective in failing to seek a separate instruction on territorial jurisdiction or to challenge such jurisdiction before the jury; and such a claim had not been preserved at trial as a matter of law. *Id.* at 11–14. He further held that Rodriguez had failed to raise at trial, and therefore had not preserved, his request for an accomplice-in-fact instruction. Nor had he raised below any claim as to Martha's Rhode Island testimony; in any event, the record established that Rodriguez's counsel had received that testimony before the Bronx DA did. *Id.* at 8, 9 n.5.

As to the claim of ineffective assistance, Justice Donnino held that there had been ample reason for Del Valle not to press a territorial jurisdiction argument before the jury, because it "lacked merit," and because arguing the technical point as to the location of Gomez's death "could only have harmed the defense." *Id.* at 17–18. And Del Valle had "in fact attempted to make affirmative use of the New York connection as raising doubt as to whether [Rodriguez] was involved in the killing in the first place." *Id.* at 18. Further, he held, there had been good

reason for counsel "not to bother" seeking an accomplice-in-fact instruction as to Martha.  The evidence did not support that she had been an accomplice, as she had not been charged with any crime, she had first learned of the plan to kidnap and murder Gomez by overhearing it from her bedroom as the plan unfolded, and she had been threatened by Rodriguez not to reveal his crime. *Id.* at 19.  "[W]ith little chance of persuading the jury that she was an accomplice, it would be (and was) a reasonable strategy to avoid" requesting an accomplice-in-fact charge.  *Id.* at 20.

### b.    The 440.10 Motion

On September 5, 2015, Rodriguez, again through Sussman, filed a motion under NYCPL § 440.10 to vacate his conviction and sentence.  Dkt. 12-13 ("440.10 Motion.").  The 440.10 motion raised four grounds for relief, tracking those in the unsuccessful 330.30 motion.  These were: (1) the trial court erred in failing to deliver an accomplice-in-fact charge with respect to Martha's testimony; (2) the Bronx DA violated *Rosario* in failing to turn over Martha's Rhode Island testimony; (3) territorial jurisdiction had not been proven beyond a reasonable doubt; and (4) Del Valle had been ineffective for failing to challenge territorial jurisdiction or request an accomplice-of-fact charge.  *Id.*  Sussman attached a copy of Martha's Rhode Island testimony to the 440.10 Motion, which did not indicate the date or caption of the proceeding in which she had testified.  *Id.* at 18–47.  The Bronx DA opposed the motion.  Dkt. 12-14.

On April 21, 2016, the Bronx Supreme Court Justice Robert E. Torres denied the motion without a hearing.  Dkt. 12-15 ("440.10 Decision").[2]  Justice Torres noted that Rodriguez had failed to perfect direct appellate review of the claims raised in the 440.10 Motion, despite the opportunity to do so.  *Id.* at 5.  The *Rosario* claim was based on "unsubstantiated and self-serving

---

[2] Like the Report, the Court cites to the amended version of Judge Torres's decision.  *See* Report at 15 n.9; Dkt. 12-15 at 4–6.

allegations," and had not been supported by an "affidavit from trial counsel" or an explanation of where counsel had obtained Martha's Rhode Island testimony.  *Id.* at 6.  Judge Torres also found that Rodriguez had failed "to establish the material inconsistency necessary to show prejudice that would amount to a reasonable possibility the trial would have resulted differently."  *Id.*

On May 31, 2016, Rodriguez, now *pro se*, filed an application under NYCPL § 460.15 for leave to appeal a 440.10 Decision.  Dkt. 12-16.  On October 2016, the Appellate Division, First Department ("Appellate Division") denied his application.  *See People v. Rodriguez*, No. M-2983, 2016 WL 5822383 (1st Dep't Oct. 6, 2016) ("*Rodriguez IV*"); Dkt. 12 ¶ 30.

<i>c.     Appeals</i>

In July 2017, nearly 15 years after filing his notice of appeal, Rodriguez filed a direct appeal to the Appellate Division.  Dkt. 12 ¶ 35; Dkt. 12-17.  Through assigned counsel (Marisa K. Cabrera, Esq., of the Center for Appellate Litigation), Rodriguez largely reprised his earlier arguments.  He argued that (1) territorial jurisdiction had not been proven beyond a reasonable doubt, (2) Del Valle had been ineffective for failing to move to dismiss the Indictment or to request a territorial jurisdiction charge, and (3) Del Valle had been ineffective for failing to request an accomplice-in-fact charge as to Martha and for waiving Rodriguez's right to challenge Dr. Ely's testimony as violative of the Sixth Amendment's Confrontation Clause.  Dkt. 12-18. Rodriguez filed a *pro se* appellate brief, in which he argued that the Bronx DA had violated *Rosario* and *Brady* by not disclosing Martha's Rhode Island testimony, and that Del Valle failed to investigate Martha reasonably.  Dkt. 12-20.

On March 29, 2018, the Appellate Division unanimously affirmed Rodriguez's conviction.  *People v. Rodriguez*, 159 A.D.3d 646 (1st Dep't 2018) ("*Rodriguez V*" or the "State Court Decision"); Dkt. 12-21 (same).  It held that "territorial jurisdiction in New York was established beyond a reasonable doubt," citing the statutory presumption, the "extensive proof

15

that the victim died in New York," and "circumstantial evidence," including that Rodriguez's "plan [had been] to take the victim to New York and kill him there," and "convincing forensic evidence supporting the same conclusion." *Rodriguez V*, 159 A.D. 3d at 647.  And it noted that Rodriguez had "offer[ed] little more than speculation that the victim may have died on the way to New York." *Id.*

The Appellate Division further held that Rodriguez had "received effective assistance of counsel under the state or federal standards." *Id.*  Rodriguez had not shown that Del Valle's failure to request a jury instruction as to territorial jurisdiction, or move to dismiss on that ground, "fell below an objective standard of reasonableness," or that Rodriguez had been prejudiced by the lack of such an instruction.  *Id.*  And, as to any of the claimed lapses, Rodriguez had failed to satisfy—under federal or state law—either the reasonableness or prejudice prongs of an ineffective assistance claim.  In particular, "[t]here was no basis for counsel to request an accomplice-in-fact charge regarding a prosecution witness, because there was no evidence to support an inference that she participated in this crime." *Id.*  And, "[t]o the extent that, independent of his ineffective assistance claims, [Rodriguez sought] review of any of the above-discussed issues," they were unpreserved; the Appellate Division declined to review them.  *Id.* at 648.  Finally, the Appellate Division held that Rodriguez's *pro se* arguments were "procedurally defective, because they involve matters outside the record." *Id.*

On June 12, 2018, the New York Court of Appeals denied Rodriguez's application for leave to appeal the State Court Decision.  *People v. Rodriguez*, 31 N.Y.3d 1121 (2018) ("*Rodriguez VI*").

C.     **The Instant Petition**

On September 10, 2019, Rodriguez filed the instant petition through new counsel.  Dkts. 1, 1-1.

## II.    Discussion

### A.    Applicable Legal Standards

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When specific objections are made, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3); *see United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record."  *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v. U.P.S.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, a district court will review the Report and Recommendation strictly for clear error.  *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. July 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

### B.    Application

Although objecting to the Report's bottom-line recommendation to deny his petition, Rodriguez does not object to numerous determinations in the course of the Report's analysis. Two such determinations favor Rodriguez, to wit, that he exhausted his ineffective assistance of counsel, *see* Report at 32, and *Rosario* and *Brady*, *id.* at 45–46, claims.  Others do not.  These

include the Report's determinations that (1) Rodriguez's claim of ineffective assistance lacks

merit, to the extent it is based on trial counsel's not having objected to Dr. Ely's testimony about

the autopsy report or on trial counsel's purportedly not having "investigated" Martha's Rhode

Island testimony, *id.* at 31; (2) Rodriguez's claim that the Bronx DA violated *Rosario* and *Brady*

is procedurally barred on federal habeas review by an adequate and independent state ground, *id.*

at 46; and (3) regardless, Rodriguez's *Rosario* claim is not cognizable on federal habeas review

because the duty to turn over *Rosario* material arises under state, not federal, law, *id.* at 46–47.

Accordingly, the Court has reviewed those conclusions for clear error only.  The Court's review

of Judge Cave's exceptionally careful and well-reasoned analysis does not reveal any facial error

as to these determinations.

Rodriguez instead makes five objections to the Report.  He argues that, contrary to the

Report: (1) he exhausted his federal claim that New York lacked territorial jurisdiction over his

prosecution, Obj. at 2; (2) he presented sufficient evidence to rebut the presumption, implicated

by the discovery of Gomez's body in the Bronx, that the murder occurred in New York, *id.* at 2–

4; (3) Del Valle was ineffective for failing to challenge territorial jurisdiction and to request a

territorial jurisdiction charge, *id.* at 4–5; (4) Del Valle was ineffective for failing to request an

accomplice-in-fact charge as to Martha's testimony, *id.* at 5–6; and (5) Martha's Rhode Island

testimony was favorable to Rodriguez and improperly withheld, in violation of *Brady*, *id.* at 7–8.

With the exception of the first, Rodriguez's objections do no more than reiterate the

Petition's original arguments.  Specifically:

- As to the evidence that the murder occurred in New York, Rodriguez's Objections

    reprise his arguments that the jury could have found otherwise.  These were based on

    testimony that Gomez struggled, and became silent, at some point on the drive to

New York, *compare* Petition at 17–18, *with* Obj. at 3; and his argument that the jury should not have credited Dr. Ely's time-of-death estimate, because she did not personally perform the autopsy or write the autopsy report, *compare* Petition at 19–20, *with* Obj. at 3–4.  But as Judge Cave perceptively noted, the trial court properly instructed the jury on territorial jurisdiction, and the assembled evidence, including Dr. Ely's properly received testimony, gave it an ample basis on which to infer that Gomez had not expired until the car in whose trunk he was held had crossed the New York border.  That assessment tracked the thoughtful findings of the various state courts—trial and appellate—that previously considered, and uniformly rejected, Rodriguez's challenge to the sufficiency of the evidence as to jurisdiction.

- As to Rodriguez's two theories of ineffective assistance, these also reprise his Petition's arguments.  *Compare* Petition at 21–22 (failure to request territorial jurisdiction instruction or challenge territorial jurisdiction), 23 (failure to request accomplice-in-fact charge), *with* Obj. at 4–5 (territorial jurisdiction), 5–6 (accomplice-in-fact).  As reviewed above, these arguments, too, have repeatedly been rejected by state courts, for sound reasons.

- As to Rodriguez's objection that the prosecution's failure to disclose Martha's testimony in a separate proceeding violated *Brady*, it, too, repeats the claim in his Petition.  *Compare* Petition at 27–31, *with* Obj. at 7–8.  This theory has also been repeatedly rejected, for good reason, by the state courts.[3]

---

[3] As the Report correctly determined, Rodriguez's claim of a *Brady* violation is barred on habeas review by the presence of adequate and independent state grounds.  *See* Report at 46.  Rodriguez did not object to this determination.  Obj. at 7–8.

Accordingly, the Court reviews the Report's determinations on these points strictly for clear error. *See Dickerson*, 2013 WL 3199094, at *1; *Kozlowski*, 2012 WL 383667, at *3. After careful review of each issue, the Court, again, does not find any in Judge Cave's thoughtful analysis, whether reviewed *de novo* or for clear error.

The Court then turns to the first of Rodriguez's objections—to the Report's finding that he did not exhaust his federal constitutional challenge to the purported absence of evidence of territorial jurisdiction. This objection alone is "specific and clearly aimed at particular findings in the magistrate judge's report" so as to justify *de novo* review. *See Kelley v. Universal Music Grp.*, No. 14 Civ. 2968 (PAE), 2017 WL 3995623, at *2 (S.D.N.Y. Sept. 11, 2017). But it, too, is easily put aside. As the Report correctly reasoned, Rodriguez's state appellate brief did not "fairly present" Rodriguez's territorial jurisdiction claim in federal constitutional terms, as the Antiterrorism and Effective Death Penalty Act ("AEDPA") requires. *See* 28 U.S.C. §§ 2254(b)(1), (c); *see, e.g., Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (under AEDPA, state prisoner must exhaust available state remedies, which requires "fairly present[ing]" a claim and its federal nature to each appropriate state court, to "giv[e] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights" (internal quotation marks omitted)); *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005) (exhaustion requirement not satisfied unless federal claim was "fairly presented" to state courts, under 22 U.S.C. §§ 2254(b), (c)). Rodriguez thus did not give the state courts an opportunity to address and correct the alleged violations. *See Picard v. Connor*, 404 U.S. 270, 275 (1971).

Rodriguez's state appellate brief does reference the Sixth and Fourteenth Amendments of the U.S. Constitution in a question presented, Dkt. 12-7 at 2, and in a section heading, which read:

> (a) The prosecution failed to prove beyond a reasonable doubt that New York State had territorial jurisdiction, or, alternatively, (b) defense counsel was ineffective in failing to move to dismiss and request a territorial jurisdiction jury instruction, where the kidnaping [sic] occurred in Rhode Island and, other than the deceased's remains there was no evidence that the homicide occurred in New York.  U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6.

Dkt. 12-7 at 18.  But as the above reflects, the brief divided Rodriguez's arguments and analysis into two distinct sections.  *See* Reply Obj. at 3.  In the first, which captured Rodriguez's territorial jurisdiction argument, Rodriguez's brief cited only New York state authorities.  *See* Dkt. 12-17 at 19–23.  And, as the Report noted, where a petitioner puts claims exclusively in state-law terms, he fails to fairly present a federal claim.  *See* Report at 26–27 (collecting cases); *see, e.g.*, *Jefferies v. Sheahan*, No. 15 Civ. 2890 (PKC) (SN), 2016 WL 3660767, at *8 (S.D.N.Y. Mar. 10, 2016) (federal constitutional claim unexhausted where state brief only cited state law), *report and recommendation adopted*, 2016 WL 3661546 (S.D.N.Y. July 5, 2016); *Pham v. Kirkpatrick*, 209 F. Supp. 3d 497, 511 (N.D.N.Y. 2016) (federal claim unexhausted where, *inter alia*, petitioner argued entirely in terms of state law); *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 362–63 (N.D.N.Y. 2013) (same); *Jones v. Annucci*, 124 F. Supp. 3d 103, 116 (N.D.N.Y. 2015) (same); *Glisson v. Mantello*, 287 F. Supp. 2d 414, 419–20 (S.D.N.Y. 2003) (brief reference to state court decision did not give Appellate Division notice that petitioner was raising federal constitutional issue); *Oliver v. Greiner*, No. 01 Civ. 4223 (DC), 2002 WL 1758915, at *3 (S.D.N.Y. July 30, 2002) (federal claim unexhausted where petitioner cited no federal case law and argued solely in terms of New York statutory and case law).  *Contra Rosa*, 396 F.3d at 219 (petitioner exhausted state remedies where he relied on pertinent federal cases employing constitutional analysis and state cases employing analogous constitutional analysis— terms "so particular as to call to mind a specific right protected by the [federal] Constitution"— and explicitly claimed that rights had been violated under U.S. Constitution).

To the extent that Rodriguez's state court brief cited federal cases at all, it only did so to support his second, alternative, argument, that his counsel had been ineffective. That is evident both from the placement of his federal citations, *see, e.g.*, Dkt. 12-17 at 19, and the substance of his legal arguments, which are directed only to the claim of ineffective assistance, *see id.* at 19–29. Unsurprisingly, the state courts analyzed (and rejected) Rodriguez's territorial jurisdiction claim solely under New York state law. *See Rodriguez V*, 159 A.D.3d at 647 (quoting NYCPL § 20.20(2)(a)); 330.30 Decision at 9–16. Therefore, although Rodriguez repeatedly asserted the absence of territorial jurisdiction, his claim that the United States Constitution was violated as a result has never been raised in state court, despite multiple opportunities.

In his Objections, Rodriguez argues that a petitioner need only cite the federal source of law on which he relies to alert a state court to the federal nature of his claim. *See* Obj. at 2 (quoting *Baldwin*, 541 U.S. at 32). But Rodriguez takes that proposition out of context. *See Baldwin*, 541 U.S. at 32 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief . . . by citing *in conjunction with the claim* the federal source of law on which he relies[]." (emphasis added)). A prisoner cannot rely on a court to discover—based on a federal-law citation in a portion of a brief directed to a different subject—the existence of a federal claim where none is fairly suggested by the context or language used. *See id.* at 31; *see also Giraldo v. Bradt*, No. 11 Civ. 2001 (JFB), 2012 WL 3835112, at *9 (E.D.N.Y. Sept. 5, 2012) (same). That Rodriguez referenced federal law in a portion of a header directed to a different claim, or in a separate subsection altogether, was insufficient to alert the state court that he meant to press a federal constitutional claim as to territorial jurisdiction. *Cf. Gray v. Netherland*, 518 U.S. 152, 163 (1996) (state court not required to consider constitutional violations *sua sponte*).

Accordingly, the Report correctly determined that Rodriguez's territorial jurisdiction claim is procedurally defaulted.  *See Carvajal v. Artus*, 633 F.3d 95, 104–05 (2d Cir. 2011) ("When a habeas applicant fails to exhaust his federal constitutional claim in state court—and there has been no showing of cause and prejudice or actual innocence—this Court will generally be barred from granting habeas relief.").

In any event, even if Rodriguez had raised and not procedurally defaulted this federal claim, and had identified case authority under which the absence of geographic jurisdiction in the state of prosecution gave rise to a federal constitutional claim, his claim here would fail.  That is because, as every decision to consider the question—including most recently the Report—has concluded, there was sufficient evidence on which a jury could find that the murder victim here, Gomez, died in New York.  *See* Report at 28–31; *Rodriguez V*, 159 A.D. 3d at 647 ("Here, in addition to the statutory presumption, there was extensive proof that the victim died in New York."); 330.30 Decision at 11–13 ("[T]he trial evidence alone overwhelmingly demonstrated that New York had jurisdiction over Ricardo Gomez's murder because he died in New York."); *id.* at 12 (at trial, there was "a plethora of additional evidence" beyond the statutory presumption that "further buttressed the conclusion that Ricardo Gomez died in New York"); *see also Rodriguez VI*, 31 N.Y.3d 1121 (denying leave to appeal decision in *Rodriguez V*); *Rodriguez IV*, 2016 WL 5822383 (denying leave to appeal denial of 440.40 motion); 440.40 Decision at 5 (denying all claims without a hearing "because sufficient facts appear on the record . . . to permit adequate appellate review").  And the jury here was properly instructed on that point.  New York thus had geographic jurisdiction here.  And therefore, Rodriguez's federal claim here, even if not procedurally defaulted, would fail on the merits.

## CONCLUSION

For the foregoing reasons, the Court adopts Judge Cave's perceptive, comprehensive, and convincing Report and Recommendation in full.  The September 10, 2019 petition for a writ of habeas corpus is denied.

The Court declines to issue a certificate of appealability.  Rodriguez has not made a substantial showing of a denial of a federal right.  Appellate review is therefore not warranted. *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005); 28 U.S.C. § 2253.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith.  Therefore, *in forma pauperis* status is denied for the purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

The Clerk of the Court is respectfully directed to terminate all pending motions, to mail a copy of this order and appeal instructions to petitioner at his address of record, to send a copy of appeal instructions to respondent, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 13, 2023
New York, New York

24